IRVING COHEN
233 Broadway, Suite 2701
New York, New York 10279
(212) 964-2544
Attorney for Plaintiff
(IC 3708)

**JUDGE SULLIVAN**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**12 CV 5933**

------------------------------------------------------------

CURTIS MITCHELL, DEMETRICE PERRY,
SHAQUWAN PERRY, SHAQUANA PERRY, and
NINA WILLIAMS

RECEIVED
AUG 02 2012
U.S.D.C. S.D. N.Y.
CASHIERS

                    Plaintiffs,

COMPLAINT AND
DEMAND FOR JURY TRIAL

                    -v-

CITY OF NEW YORK, OFF. DAVID LAMBERT (Shield No.12878)        12 CV
OFF. JOHN AND JANE DOES, POLICE  OFFICERS FOR
THE CITY OF NEW YORK, INDIVIDUALLY AND AS
POLICE OFFICERS FOR THE CITY OF NEW YORK,
                    Defendants
---------------------------------------------------------------- x


## INTRODUCTION

1. This is an action for damages for the wrongful acts of defendants NEW YORK CITY and

OFF. DAVID LAMBERT, OFF. JOHN and JANE DOES of the New York City Police Department,

all acting under color of state law and pursuant to their authority, in violation of plaintiffs' rights

under the Constitution and laws of the United States and the State of New York.

2. Plaintiffs allege that beginning on or about May 5, 2011, defendants committed wrongful

and illegal acts against Plaintiffs by falsely arresting them and imprisoning them, maliciously

prosecuting one of them (Curtis Mitchell), and violating their Federal and New York State civil

rights.

1

## JURISDICTION

3.  This action is brought under 42 U.S.C. Section 1983 in conjunction with the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and the constitutional, statutory and common laws of New York State.

4.  Jurisdiction is invoked herein pursuant to the aforementioned statutory and constitutional provisions and pursuant to 28 U.S.C. Section 1331 and 1343, this being an action seeking redress for the violation of the plaintiffs' constitutional and civil rights.

5.  Plaintiffs further invoke this Court's pendant jurisdiction over any and all state law claims and causes of action which derive from the same nucleus of operative facts that give rise to the federally based claims and causes of action, pursuant to Title 28, U.S.C. section 1367.

6.  Venue is laid within the United States District Court for the Southern District of New York in that the defendants reside in and their principal place of business is located in the Southern District of New York.

## TRIAL BY JURY

7.  Plaintiffs demand a trial by jury on each and every one of their claims as pled herein.

## PARTIES

8.  At all times relevant hereto, plaintiffs CURTIS MITCHELL, DEMETRICE PERRY, SHAQUWAN PERRY, SHAQUANA PERRY and NINA WILLIAMS were residents of Brooklyn, New York.

9.  At all times relevant hereto, defendant NEW YORK CITY was and is a municipality of the State of New York and owns, operates, manages, directs and controls the New York City Police Department, which employs the other named defendants.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

2

10. Defendant DAVID LAMBERT is and was at all times relevant to this action a police officer, employed by the New York City Police Department, and acting under color of state law. He is being sued in both his individual and official capacities.

11. Defendants JOHN and JANE DOES are and were at all times relevant to this action police officers, employed by the New York City Police Department, and acting under color of state law. They are being sued in both their individual and official capacities.

12. At all times relevant hereto and in all their actions described herein, defendants DAVID LAMBERT, JOHN AND JANE DOES were acting under color of the statutes, ordinances, regulations, policies, customs and usages of the New York City Police Department and New York City, pursuant to their authority as employees, servants and agents of the New York City Police Department, within the scope of employment and incidental to their otherwise lawful duties and functions as employees, servants, agents and police officers.

13. The conduct and injuries complained of herein ensued without any negligent or culpable conduct on the part of plaintiffs.

## NOTICE OF CLAIM

14. On July 28, 2011, plaintiffs' Notices of Claim were filed with the Comptroller's Office of the City of New York. More than thirty days have elapsed since the filing of the Notices of Claim and these matters have not been settled nor otherwise disposed of.

15. On January 24, 2012, hearings pursuant to New York State General Municipal Law §50-h were held at which time plaintiffs were questioned by a representative of defendant New York City.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

3

16. The transcripts of these hearings are attached hereto as Exhibit A-1 through A-5 and as factual support for the causes of action alleged herein and are made a part of this Complaint.

## FACTUAL BACKGROUND

17. Plaintiff's Curtis Mitchell and Demetrice Perry were residing at 433 Lafayette Avenue, Apt.12A, Brooklyn, New York 11238, along with Ms. Perry's two children, Shaquwan Perry and Shaquana Perry on the date in question, May 5, 2011.

18. All were present in the apartment at approximately 6:25AM when police forcibly and without permission or proper authority entered the premises.

19. Also present in the apartment was a guest, Plaintiff Nina Williams.

20. Mr. Mitchell also resided at that time, sometimes two or so nights a week, at 155 Clifton Place, Brooklyn, New York 11238, the home of his father and other family members.

21. At approximately 6:25 AM on May 5, 2011, police officers broke through the entrance door to the apartment.

22. They then broke into the bedroom in which Mr. Mitchell and Ms. Demetrice Perry were sleeping.

23. They were wearing helmets, other special gear and carrying firearms.

24. They told the occupants to freeze.

25. They grabbed Mr. Mitchell and handcuffed him.

26. They also handcuffed Ms. Demetrice Perry.

27. Without asking any questions nor uncovering any evidence of a crime, Mr. Mitchell and Ms. Perry were detained, handcuffed and effectively placed under arrest.

28. Despite asking what was the reason for their entrance into the apartment and being

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

4

placed into custody, the police only told Mr. Mitchell that they had to wait for a detective to arrive.

29. A detective arrived later and started screaming at Mr. Mitchell.

30. He asked Mr. Mitchell to tell him about guns and drugs.

31. Mr. Mitchell was telling the detective that he's got the wrong person.

32. The detective threatened Mr. Mitchell, telling him that if he didn't tell him where guns and drugs were, the detective would arrest his whole family and take them to jail.

33. By that time, the police had all the plaintiffs in custody.

34. Everyone was handcuffed except Shaquana who was holding her two-week old baby.

35. Mr. Mitchell was searched but no contraband was found.

36. Despite the lack of any evidence of a crime, Mr. Mitchell was arrested, removed from the apartment and taken to the 79th Precinct.

37. Mr. Mitchell was strip-searched.

38. Eventually, Mr. Mitchell was told he was being charged with possession of heroin.

39. Mr. Mitchell was innocent of that crime and there was no basis to arrest him for it.

40. After Mr. Mitchell went before the judge, over fourteen hours later, he was then remanded to Rikers Island.

41. Because Mr. Mitchell was innocent, he decided to testify before the grand jury that was hearing his case.

42. This was almost two weeks after his arrest.

43. On May 20, 2011, the Grand jury voted not to indict Mr. Mitchell and dismissed the case against him. (See Ex.B)

44. As a result, Mr. Mitchell was released from custody.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

5

45. When Mr. Mitchell returned to the apartment, it remained in the same condition it was after his arrest after the police searched it.

46. Many personal possessions had been effectively destroyed.

47. The apartment had been completely searched.

48. The police had opened all the closets and the drawers, thrown all the personal property around and, in general, left the apartment in a complete mess.

49. Ms. Perry had recorded the condition of the apartment after the police ransacked it with a camcorder.

50. Ms. Perry, who had never been arrested, had lived in the same apartment for twelve years.

51. Also living there on May 5, 2011 were her son, Shaquwan and daughter, Shaquana and her infant granddaughter who was only two weeks old.

52. Nina Williams, a friend, was a visitor.

53. Ms. Demetrice Perry was sleeping when the police shone a light in her face about 6:20 AM.

54. Ms. Perry was under the covers and had no clothes on.

55. The police had kicked her bedroom door open.

56. About six police officers had come into her bedroom dressed like a "SWAT" team.

57. They were armed with firearms including long guns with lights on them.

58. One of the firearms was placed right in her face.

59. She was forced out of bed, threw on something and was immediately handcuffed.

60. Mr. Perry asked to see a warrant but was not shown one. (See Ex.C, search warrant)

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

61. She was taken to the living room where she saw her son Shaquwan and visitor Nina Williams in handcuffs.

62. They were forced to stand in the living room handcuffed for over a half hour.

63. During that time, the police "tore up" the entire apartment.

64. They pulled everything out of the closets and drawers, lifted up the mattresses and threw everything around; knocked lamps down and pulled containers down.

65. They took cash and silver dollars that Ms. Perry was saving for her granddaughter.

66. They also ransacked the second bedroom where Shaquana and her two-week old baby had been sleeping.

67. The police threw all the baby's clothes around and flung her stroller.

68. After the half-hour in the living room, the police took Ms. Perry, her son, her daughter and infant, and Nina Williams into Shaquana's room and made them stay there handcuffed for an hour.

69. The police had opened all the windows causing the baby to catch a cold.

70. The police remained in the apartment for about three hours and stayed there for a least two hours even after Mr. Mitchell was taken to the precinct.

71. Since the police had busted open the front door and destroyed it, Ms. Perry had to replace it with a brand new one.

72. Appliances like a DVD player that the police broke had to be replaced.

73. As a result of the trauma caused by the police, Mr. Perry sought the help of a psychiatrist whom she has seen over ten times.

74. She has difficulty sleeping and relives the experience.

75. She was prescribed medication in June, 2011 to calm her nerves which she continues to

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

7

take.

76.  Plaintiff Nina Williams, Shaquana's friend, had been in her and her baby's room when the police confronted them

77.  The police came into the room and put guns and lights in their faces.

78.  The police were wearing shields and helmets.

79.  Ms.  Williams, who had been wearing only a bra and boxers, was not permitted to put clothes on and was handcuffed.

80.  Ms.  Williams was taken into the living room and remained there for a long time - still undressed - and handcuffed.

81.  She was asked no questions.

82.  She observed the police opening the kitchen cabinets and throwing around items therein including flour and sugar.

83.  At the time the police came into Shaquana's room, she was sitting on the bed rocking her two-week old infant daughter, Arianna.

84.  Shaquana heard banging and booming.

85.  As she walked to the bedroom door, it was bust open and she saw a lady with a gun in Arianna's face screaming "let me see your hands."

86.  The police took her (and the baby) into the livingroom.

87.  Shaquana asked to go get a sheet to cover the baby because the windows had been opened but the police refused.

88.  Despite many requests, the police did not show the Plaintiffs' a warrant.

89.  After the incident, Shaquana had to replace some of her daughter's clothes because the police had thrown them down and stepped all over them.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

90. Shaquana has had to take her daughter to the doctor because, since the incident, she wakes up and cries when she hears noises.

91. Shaquwan, who was sixteen at the time, was sleeping in the living room when the police broke into the apartment, shined a flashlight on him, put a gun to his face and handcuffed him.

## COUNT ONE: VIOLATION OF CONSTITUTIONAL RIGHTS

92. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-91 of this complaint, as though fully set forth herein.

93. The acts, omissions and conduct of the defendants, all members of the New York City Police Department, and all acting under color of state law, deprived plaintiffs of their rights, privileges and immunities under the laws and Constitution of the United State; in particular the rights to be secure in their person and property, to be free from false arrest, false imprisonment, malicious prosecution, excessive force and cruel and unusual punishment and to due process.

94. By these acts, omissions and conduct, these individual defendants have deprived plaintiffs of rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983, for which the defendants are individually liable.

## COUNT TWO: VIOLATION OF CONSTITUTIONAL RIGHTS
### (Defendant New York City)

95. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-94 of this complaint, as though fully set forth herein.

96. The acts, omissions and conduct of defendant New York City, as set forth above, deprived plaintiffs of their rights, privileges and immunities under the laws and Constitution of the United States; in particular the rights to be secure in their person and property; to be free from

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

9

unlawful seizure, false imprisonment, malicious prosecution; excessive force and cruel and unusual punishment and to due process.

97. By these acts, omissions and conduct, defendant New York City has deprived plaintiffs of rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983.

## COUNT THREE: CONSPIRACY TO VIOLATE CIVIL RIGHTS

98. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-97 of this complaint as though fully set forth herein.

99. The defendants conspired to violate plaintiffs' civil rights by agreeing between themselves to falsely place them in custody, charge one of them with crimes as described above, in violation of 42 U.S.C. 1983, for which defendants are individually liable.

## COUNT FOUR: FALSE ARREST

100. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-99 of this complaint, as though fully set forth herein.

101. The acts, omissions and conduct of defendants as alleged above, constitute false arrest under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

## COUNT FIVE: FALSE IMPRISONMENT

102. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-101 of this complaint, as though fully set forth herein.

103. The acts, omissions and conduct of defendants, as alleged above, constitute false imprisonment under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

## COUNT SIX: ASSAULT

104.  Plaintiffs repeat and re-allege the allegations in paragraphs 1-103 of this complaint, as though fully set forth herein.

105.  The acts and conduct of defendants, as alleged above, constitute assault under the laws of the State of New York.  This Court has pendant jurisdiction to hear and adjudicate such claims.

## COUNT SEVEN: MALICIOUS PROSECUTION

106.   Plaintiff CURTIS MITCHELL repeats and re-alleges the allegations contained in paragraph 1-105 of this complaint, as though fully set forth herein.

107.  The acts, omissions and conduct of defendants, as alleged above, constitute malicious prosecution under the laws of the State of New York.  This Court has pendant jurisdiction to hear and adjudicate such claims.

WHEREFORE, plaintiffs demand the following relief;

a.  Compensatory damages in the amount of two million ($2,000,000 dollars).

b.  Punitive damages in the amount of two million ($2,000,000 dollars).

c.  Reasonable attorneys fees and costs; and

d.  Such other and further relief as appears reasonable and just.

Dated: New York, New York
   August 1, 2012

       IRVING COHEN
       Attorney for Plaintiff
       233 Broadway, Suite 2701
       New York, New York 10279
       (212) 964-2544

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

ORIGINAL

50-H HEARING                                    015220

- - - - - - - - - - x  BLA: 2011PI027480

In the Matter of the Claim of

CURTIS MITCHELL,

        Claimant,

     -against-

CITY OF NEW YORK, NEW YORK CITY POLICE

DEPARTMENT,

        Respondents.

- - - - - - - - - - x

                225 Broadway, 13th Floor
                New York, New York

                January 24, 2012
                12:12  p.m.


    50-H HEARING of Curtis Mitchell, the

Claimant in the above-entitled action, held at

the above time and place, pursuant to Notice,

taken before Karla Vallaro, a shorthand

reporter and Notary Public within and for the

State of New York.

Ex A-1

**Reporter's Ink, Corp.**   90 John Street - Ste. 411   New York, NY 10038   www.reporters-ink.com
Phone: 646.395.2522   Fax: 212.374.1236

1

2                        A p p e a r a n c e s :

3         IRVING COHEN, ESQ.
                  ATTORNEY for Claimant
4                 233 Broadway, Suite 2701
                  NEW YORK, NY 10279
5         BY:  IRVING COHEN, ESQ.

6


7
          SHAPIRO, BEILLY & ARONOWITZ, LLP
8                 ATTORNEYS for Respondents
                  225 Broadway, 13th Floor
9                 New York, NY 10007
          BY:  DAWN SHWARTZ, ESQ.
10                FILE #: NYC-2212
                  INDEX #: 2011PI027480
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C. MITCHELL

1

2  CURTIS MITCHELL, the witness herein, having

3  been first duly sworn by a Notary Public of

4  the State of New York, was examined  and

5  testified as follows:

6  EXAMINATION BY

7  MS. SHWARTZ:

8      Q.  State your name for the record,

9  please.

10     A.  Curtis Mitchell.

11     Q.  State your address for the record,

12  please.

13     A.  155 Clifton Place, Brooklyn, New

14  York 11238.

15     Q.  Good afternoon, sir.  My name is

16  Dawn Shwartz and I represent the city for the

17  purposes of today's hearing.  I'll be asking

18  you some questions about your claim against

19  the city.

20         I'm going to ask that all of your

21  answers to my questions are verbal, so that

22  the court reporter can down everything that

23  we're saying, because she can't take down

24  head shakes, head nods or hand gestures.  If

25  you don't understand my question, let me



<pre>
 1                    C. MITCHELL
 2    know.  I'll try to rephrase it for you or say
 3    it in a different way.
 4           If you need to speak with your
 5    attorney for any reason or take a break for
 6    any reason that's not a problem, just let us
 7    know.  All I ask is that you answer the last
 8    question that I asked you before you go ahead
 9    and take that break.  I'm also going to ask
10    that even if you know what I'm going to ask
11    you and you know what your answer is, you let
12    me finish asking the question and then give
13    your answer, because she can only take down
14    what one of us is saying at a time.
15        A.  I got you.
16        Q.  How long have you lived at the
17    address that you just gave to the reporter?
18        A.  Lets say twenty, thirty years.
19    Somewhere along there.
20        Q.  Does anybody currently live there
21    with you?
22        A.  That's my father's house and I stay
23    there with them.
24        Q.  What is your dad's name?
25        A.  Charles Mitchell.
</pre>



C. MITCHELL

1

2      Q.  When you say you stay there with

3      them, who are you referring to?

4           A.  My sisters and brothers there also.

5           Q.  How many nights a week do you stay

6      at the Clifton Place address?

7           A.  Lets say about sometimes two -- two

8      nights.  It all depends on if I'm doing

9      security, because I do night security off and

10     on.  And if, you know, I would say, well if I

11     need to stay there.  You know, a few nights.

12          Q.  Do you have any other place that you

13     reside?

14          A.  Well, I stay with my girlfriend.

15     Sometimes, I go over there.

16          Q.  Where does she live?

17          A.  She lives at 433 Lafayette Avenue.

18          Q.  Is that an apartment number or

19     private house?

20          A.  12A.

21          Q.  What borough is that in?

22          A.  That's in Brooklyn.

23          Q.  What is your girlfriend's name?

24          A.  Ann Perry.

25          Q.  Perry, P-E-R-R-Y?

C. MITCHELL

1

2     A.   Yes.

3     Q.   How often do you stay with Ms. Perry

4 on a weekly basis?

5     A.   It would be maybe five or six.   It

6 all depends, because sometimes I work

7 security and I don't go there.   I may go by

8 my father's or stay there or I stay at the

9 security place sometimes where I use to work

10 at.   This is like on and off.   You know,

11 sometimes I have work, sometimes I don't have

12 work.   It all depends.

13    Q.   Let me ask you this, where does your

14 mail go?

15    A.   My mail goes to my father's.

16    Q.   At Clifton Place?

17    A.   Yes.

18    Q.   Have you ever gone by any other

19 names or aliases?

20    A.   Never.

21    Q.   What is your social security number?

22    A.   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.

23    Q.   Your date of birth?

24    A.   3/20/62.

25    Q.   Are you currently employed now?

C. MITCHELL

1

2      A.  Well, I just recently stopped.  I

3  worked one day last week.  That's it.  I had

4  an incident on the job, so I'm waiting to go

5  back to work.

6      Q.  Where were you working last week?

7      A.  Last week I worked over by the

8  ferry.

9      Q.  Is this for security that you

10 mentioned earlier?

11     A.  No, this is -- this is cause I'm a

12 union member.  This is construction.

13     Q.  What union are you part of?

14     A.  Labors union, Local 731.

15     Q.  Prior to last week, were you working

16 on a regular basis?

17     A.  I had just recently stopped November

18 7th.  You know, the job came to an end.

19     Q.  Aside from your work in construction

20 are you currently earning income any other

21 way?

22     A.  No.

23     Q.  Are you currently receiving any

24 Medicaid benefits?

25     A.  No.



1                    C. MITCHELL

2         Q.  Are you currently receiving any

3     Medicare benefits?

4         A.  No.

5         Q.  As an adult, have you ever been

6     convicted of or pled guilty to any crimes or

7     offenses?

8         A.  Yes.

9         Q.  When was that?

10        A.  That was in, let me see, I think it

11    was '02.

12        Q.  What was the nature of that offense?

13        A.  It was commercial burglary.

14        Q.  Did you serve any time?

15        A.  Yes.

16        Q.  How much?

17        A.  I served four years.

18        Q.  Where did you serve that time?

19        A.  I served it in a number of places.

20    I was at Adirondack, upstate.  I was Lyon

21    Mountain.  I was at Hale Creek and my last

22    stop Camp Visalia.

23        Q.  Aside from the 2002 conviction, have

24    you had any other convictions or have you

25    pled guilty to any other crimes or offenses

C. MITCHELL

1

2    as an adult?

3         A.  Yes.

4         Q.  When was that?

5         A.  Let me see, that was, when was it,

6    2000 I think.

7         Q.  What was that, sorry.

8         A.  That was that 200.  That was a

9    possession charge.

10        Q.  Possession of what?

11        A.  Crack.

12        Q.  Did you serve any time for that?

13        A.  I did, let me see.  I think I did

14   two years.

15        Q.  Any other convictions or instances

16   where you pled guilty for any crimes or

17   offenses?

18        A.  Let me see, it was in '90 I believe.

19        Q.  1990?

20        A.  Yes.

21        Q.  What was the nature of that?

22        A.  That was, that was '90.  That was a

23   possession the same thing.

24        Q.  Possession of crack?

25        A.  Yes.



1                          C. MITCHELL

2        Q.  Did you serve any time for that

3   charge?

4        A.  I did two years.

5        Q.  Any other convictions?

6        A.  '83, I think.  Yes, I believe '83.

7   That was a burglary.

8        Q.  Again, did you serve any time for

9   that?

10       A.  Yes, I did.  I think it was two and

11  third to seven.

12       Q.  Any other crimes or offenses that

13  you pled guilty to or were convicted of that

14  you can recall?

15       A.  I think it was '81.

16       Q.  What was the nature of that?

17       A.  That was burglary.

18       Q.  Any time served?

19       A.  Two years.

20       Q.  Any other crimes or offenses that

21  you pled guilty to or were convicted of?

22       A.  That's the furthest I can remember.

23       Q.  Have you ever filed a claim against

24  the City of New York before?

25       A.  I had -- let me see, that was in '89

C. MITCHELL

1
2    I did.  I lost contact with the lawyer and
3    everything.
4         Q.  What was the nature of that claim
5    against the city?
6         A.  Something happened to me inside the
7    jail where I had got cut up by an inmate.
8         Q.  Was that claim against city of New
9    York or the State of New York?
10        A.  I believe it was the city.
11        Q.  Do you know what the final outcome
12   of that claim was?
13        A.  No.
14        Q.  Did you ever receive any money or
15   settlement from that claim?
16        A.  No.
17        Q.  Is that claim still going on?  Is it
18   still pending?
19        A.  I don't know what happened.  I tried
20   to contact and they moved, because I was away
21   and I just never really pursued it.
22        Q.  Aside from the claim from 1999, have
23   you ever filed any other claims against the
24   City of New York?
25        A.  No.



12

                        C. MITCHELL

1

2      Q.  Have you ever filed to the best of

3   your knowledge, any claims against the State

4   of New York?

5      A.  No.

6      Q.  The claim today that we're here to

7   talk about, can you tell me what date that

8   happened?

9      A.  May 5th.

10      Q.  What year?

11      A.  Last year, 2011.

12      Q.  Approximately, what time did this

13   happen?

14      A.  Approximately, 6:25.

15      Q.  Do you have any independent

16   recollection of the time that happened or is

17   the paper in front of you refreshing your

18   memory as to the time it happened?

19      A.  No, I know exactly.  It happened at

20   6:25.

21      Q.  A.m. or p.m.?

22      A.  A.m. in the morning.

23      Q.  Where were you at that time?

24      A.  I was in my bed.  Sleeping in my

25   room.

                           C. MITCHELL

1

2        Q.  Which residence were you at?  Were

3   you at your dad's or your girlfriend's?

4        A.  I was at my girlfriend's.

5        Q.  That's the Lafayette Avenue

6   apartment?

7        A.  Yes.

8        Q.  Do you know prior to 6:25 a.m. if

9   there was anyone else in the apartment at

10   that time?

11        A.  Yes.

12        Q.  Do you know who was there?

13        A.  Shaquwan Perry, which is her son.

14   Her daughter Shaquana Perry and Nina.

15   Shaquana's friend and Ann, my girlfriend and

16   her daughter, her the newborn baby.  That's

17   Shaquana's daughter.

18        Q.  Your girlfriend Ann was there at

19   that time?

20        A.  Yes.

21        Q.  Whose baby was that?

22        A.  Shaquana's, her daughter.

23        Q.  How young was the baby at the time?

24        A.  Maybe two weeks.

25        Q.  The person you mentioned Nina, do

14

                          C. MITCHELL

1

2    you know who that is?

3         A.   That's her daughter's friend.

4         Q.   Do you know Nina's last name?

5         A.   I'm not sure.  I forgot it.

6         Q.   To your knowledge, was there anyone

7    else in the apartment at that time?

8         A.   No one else.

9         Q.   When did you first arrive at the

10   apartment, either the night before or that

11   morning?

12        A.   I was there a couple of days.  A

13   couple of days.

14        Q.   Had you left the apartment at all in

15   those few days?

16        A.   Yes, I had left it and came back.

17        Q.   You've been staying there for a

18   couple of days?

19        A.   Yes, I was looking for work.  Going

20   out and I would go to her place, because it

21   was around the corner from my father.  So it

22   was easy to go back and forth.

23        Q.   In May of 2011, were you working

24   your construction job or were you working

25   someplace else?



1                          C. MITCHELL

2        A.   I was in the process of getting

3    work.  I had to shape.

4        Q.   What does that mean?

5        A.   To go out with the people and look

6    for work.

7        Q.   What type of work were you looking

8    for?

9        A.   Construction.

10       Q.   On May 5th of 2011, were you

11   assigned to a construction job?

12       A.   No.

13       Q.   In the twenty-four hours prior to

14   6:25 a.m. on May 5, 2011, had you had any

15   alcoholic beverages to drink?

16       A.   No.  Nothing.

17       Q.   Had you had any prescription or non

18   prescription drugs prior, twenty-four hours

19   prior to that time?

20       A.   No.

21       Q.   At 6:25 a.m. on May 5, 2011, did you

22   have contact with anybody else within the

23   apartment?

24       A.   Just the officers that came there.

25       Q.   When did you first observe officers



                              C. MITCHELL

1

2    at the apartment?

3         A.   When they came, busted into the room

4    and woke us up.

5         Q.   When you say they busted into the

6    room, what room are you referring to?

7         A.   To Ann's room.

8         Q.   The bedroom?

9         A.   Yes.

10        Q.   Is that room where you were

11   sleeping?

12        A.   Yes.

13        Q.   When they came into the bedroom, was

14   that your first indication that the officers

15   were in the apartment?

16        A.   Yes.

17        Q.   Did you hear anything prior to that?

18        A.   No.

19        Q.   When they came into the bedroom,

20   were they wearing uniforms or regular

21   clothes?

22        A.   They was in uniforms like special

23   gear.  You know, helmets and well guns, well

24   rifles.  I don't know big files and stuff

25   like that.



17

```
 1                         C. MITCHELL
 2          Q.   How many officers came into the
 3     bedroom?
 4          A.   It was around three.
 5          Q.   Did all three officers have rifles?
 6          A.   Yes.
 7          Q.   Did all three have helmets?
 8          A.   Yes.
 9          Q.   When they came into the bedroom,
10     what did they say, if any thing?
11          A.   They said freeze, don't move and get
12     up.  Something like that, you know.
13          Q.   What did you do next?
14          A.   I stood still and I had my hands
15     out.  I think they said let me see your
16     hands.  It was like I'm waking up and it was
17     just a lot of yelling and you know.  I just
18     raised up and I had my hands up.
19          Q.   What did the officers do after you
20     raised your hands up?
21          A.   They grabbed me.
22          Q.   Where did they grab you?
23          A.   They grabbed me in the front to turn
24     me around to cuff me.
25          Q.   When they handcuffed you, did they
```



```
 1                    C. MITCHELL
 2      handcuff you behind your back?
 3           A.   Yes.
 4           Q.   When they came into the room and
 5      told you to put your hands up, did they ask
 6      for your name or your identity?
 7           A.   Not at that time.
 8           Q.   Did they ask you any questions while
 9      you were you still in the bedroom?
10           A.   They didn't ask me nothing they told
11      us to freeze, put your hands up and they
12      handcuffed me.  And they like was holding me
13      until -- you know, I was trying to ask them
14      something, but they was like telling me not
15      to say nothing and wait for the detectives or
16      whoever was suppose to come behind them
17      would tell you everything, because I was
18      asking what is this about.
19           Q.   After they handcuffed you, where did
20      they take you?
21           A.   They just took me in the hallway of
22      the apartment.
23           Q.   Outside of the apartment?
24           A.   No, of the apartment, outside the
25      bedroom.
```



C. MITCHELL

1
2    Q.   How long did you stay in that
3    hallway for?
4    A.   I would say for maybe fifteen, ten
5    minutes.   I guess they was waiting for my
6    girl and to handcuff her, cause she had to
7    put something on.
8    Q.   Did you observe them handcuff Ann
9    Perry?
10   A.   No, I was in the hallway.
11   Q.   Did she ever come out of the
12   bedroom?
13   A.   Yes.
14   Q.   When she came out of the bedroom,
15   was she handcuffed?
16   A.   Yes.
17   Q.   After ten or fifteen minutes were up
18   in the hallway, where did the officers bring
19   you next?
20   A.   They brought me into the backroom of
21   the apartment.
22   Q.   When you say backroom, what type of
23   room is that?
24   A.   It's a bedroom where Shaquana sleep
25   at, they brought me into her room.

```
1                          C. MITCHELL
2        Q.  Was she in her bedroom at the time?
3        A.  Well, at the time when I was in the
4    hallway.  It was like, they had already went
5    back there, because there was more of them.
6    Three came into my room I would say and some
7    was in the other room and some was in the
8    front.  It was quite a few you know.  And
9    they just took me into an empty room and I
10   guess she was in the front, because I didn't
11   see her in our room and nobody was in the
12   backroom.  So, I assume she was in the front.
13   Either in the living room or --
14       Q.  When they brought you into that
15   backroom, there was no one else in there?
16       A.  There was no one else there.
17       Q.  When they brought you to the
18   backroom, did they ask you any questions or
19   say anything to you?
20       A.  No, they was telling me that the
21   detective was coming, because I was still
22   trying to ask them stuff.
23       Q.  At any point did the detective come
24   to the apartment?
25       A.  Yes.
```

```
 1                    C. MITCHELL
 2         Q.  Did that detective speak with you?
 3         A.  Yes.
 4         Q.  Did he ask you any questions?
 5         A.  He just said is this you, Curtis
 6    Mitchell and I said yes.  And I was like,
 7    what's this about.  And he said well we have
 8    a search warrant, you know, for your arrest.
 9    And I said for what and he said, you know for
10    drugs.  And I said no, you got the wrong one.
11    You know.
12         Q.  When he said is this you, was he
13    showing you something at the time?
14         A.  He was showing a paper that's
15    suppose to be a search warrant, because I
16    asked him what is that.
17         Q.  After you spoke with the detective,
18    what happened next?
19         A.  He just sat me down in there and he
20    started asking me stuff about guns and drugs
21    and all this and I don't know what you
22    talking about.  So he started screaming and
23    do the right thing and tell us where it is at
24    and all this type of stuff.  You know, if you
25    don't I'm going to take your family and all
```

```
 1                        C. MITCHELL
 2   this and all of that to jail.
 3        Q.  After you were done speaking with
 4   the detective, did they ever take you out of
 5   the apartment?
 6        A.  Yes.
 7        Q.  When you came back through the
 8   apartment, did you make any observations
 9   regarding any other people that were in the
10   apartment at that time aside from the police
11   officers?
12        A.  Yes.
13        Q.  Who or what did you see at that
14   time?
15        A.  When they was taking me out I seen
16   everyone in the living room.  Ann, her
17   daughter, her son, Nina, the baby and that
18   was it.
19        Q.  The people that you saw in the
20   living room that you just mentioned, were
21   they handcuffed at that time?
22        A.  The only one that wasn't I think
23   Shaquana, because she was still holding the
24   baby.  Everybody else was handcuffed.
25        Q.  Did you have a conversation with any
```



```
 1                     C. MITCHELL
 2    of those people as you were coming back
 3    through the apartment?
 4         A.   No.
 5         Q.   When you were coming back through
 6    the apartment, did you have an opportunity to
 7    observe the condition of the apartment?
 8         A.   Well, very vaguely, because I looked
 9    in my room and all I seen was the light on
10    and the windows open and the living room was
11    a little dim, but there was an officer or two
12    in there with them.  And it was a few in the
13    kitchen and then when I went to the hallway
14    there was a few right there. I  guess they
15    was going to transport me to wherever they
16    was taking me and that's all I saw.
17         Q.   Did you observe, if anything, in the
18    apartment was overturned or damaged or
19    disturbed in any way?
20         A.   No.
21         Q.   No, you didn't observe or nothing
22    was damaged or disturbed?
23         A.   When I was being taken out nothing
24    was done yet.
25         Q.   Prior to them taking you out of the
```



1                      C. MITCHELL

2      apartment, did they search you at all?

3          A.   Yes, they searched me.

4          Q.   Did they find any thing?

5          A.   No.

6          Q.   Did they take anything out of your

7      pockets or off of you?

8          A.   No, I was in bed I had nothing.

9          Q.   After they took you out of the

10     apartment, where did they bring you to next?

11         A.   They took me to a van and they took

12     me straight to the precinct.

13         Q.   Do you know which precinct you went

14     to?

15         A.   79th Precinct.

16         Q.   When you got to the precinct, where

17     is the first place in the precinct did they

18     take you to?

19         A.   They stood me in front, I think the

20     sergeant, you know, at that desk when you

21     first come in there.  And they said something

22     to him.  Then they took me in the back in a

23     cell and they stripped searched me and then

24     they just left me back there.

25         Q.   When they stripped searched you, did



Reporter's Ink, Corp.  90 John Street - Ste. 411    New York, NY 10038   www.reporters-ink.com
                                    Phone: 646.395.2522    Fax: 212.374.1236

1                      C. MITCHELL

2    they find anything?

3         A.  Nothing.

4         Q.  When they finally brought you to the

5    holding cell, how long did they leave you in

6    there for?

7         **A.  Well, this happened like 6:00 in the**

8    **morning, they didn't come back there until**

9    **like maybe 3:00  --**

10        Q.  3:00 in the afternoon?

11        **A.  3:00 or 3:30, somewhere around**

12    **there.**

13        Q.  Once they put you in the holding

14    cell, did they take the handcuffs off of you?

15        **A.  Yes.**

16        Q.  In the time that you were in the

17    holding cell, did anyone from the precinct

18    come over to you and ask you any questions or

19    have a conversation with you?

20        **A.  No.**

21        Q.  Once 3:00 or 3:30 came, where did

22    they take you to next?

23        **A.  They took me to another area, where**

24    **they started fingerprinting me.**

25        Q.  Did they also take your photograph?



C. MITCHELL

1

2     A.   Yes, they took my photograph.

3     Q.   Did they take you out of the

4  precinct after that or did they put you back

5  into the holding cell?

6     A.   They put me in a different holding

7  cell.

8     Q.   How long did you stay in that one

9  for?

10    A.   Maybe two or three hours.

11    Q.   At at the end of that time period,

12  where did did they take you next?

13    A.   They took me to Central Booking I

14  believe.

15    Q.   How did you get to Central Booking?

16    A.   I was in the van with other

17  prisoners I believe.

18    Q.   For the ride from the precinct to

19  Central Booking, did any officer have a

20  conversation with you or ask you any

21  questions?

22    A.   Not when the ride, but I was trying

23  to get information when I was in that second

24  holding pen.  And the officer that

25  fingerprinted me I was asking him what am I

```
 1                    C. MITCHELL

 2   being charged with.

 3        Q.   This is still at the precinct --

 4        A.   Yes.

 5        Q.   The second holding cell?

 6        A.   Yes.

 7        Q.   Did he answer your question?

 8        A.   He told me that I was being charged

 9   with heroin and what else, he said heroin.

10   And I guess that was it.

11        Q.   Are you referring to heroin?

12        A.   Yes, drugs.

13        Q.   Some kind of possession charge?

14        A.   Yes, that's what he said.  Well,

15   this is what he was saying he found.  So he

16   was charging me with it.

17        Q.   The officer told you that he found

18   heroin in your apartment?

19        A.   Yes.

20        Q.   Did he say where in the apartment he

21   found it?

22        A.   He said it was in the room.

23        Q.   Which room?

24        A.   The room that I was in.

25        Q.   Did he say how much was found?
```



```
 1                    C. MITCHELL
 2        A.  He never told me how much.
 3        Q.  Do you recall if he said he was
 4   charging you with possession of it or that
 5   you were going to sell it?
 6        A.  He said possession.  That's what he
 7   said.  Possession of heroin.
 8        Q.  Did you have a conversation with
 9   anybody else at the precinct regarding the
10   charges against you or any other
11   conversations?
12        A.  It was the guy that was watching the
13   prisoners.  I just kept trying to talk to
14   him, asking him where is my arresting
15   officer.  You know, I'm here all these hours
16   and they didn't feed me or anything and I
17   wanted to know what was going on.  I mean,
18   you got me here all these hours and I wanted
19   to what took place while they was back at the
20   house and you know, I wanted to know.
21        Q.  When you finally got to Central
22   Booking, did you sit down with someone who
23   asked you your information and ask you your
24   background information?
25        A.  Yes.
```

1                    C. MITCHELL

2          Q.  At that point, did the person ask

3      you if you needed any medical attention for

4      any reason?

5          A.  Yes.

6          Q.  What was your response to that?

7          A.  I told them no.

8          Q.  Did they ask you if you had any

9      medical conditions that needed tending to?

10         A.  I told them no.

11         Q.  At that time did you indicate that

12     you had sustained any injuries while you were

13     in police custody that you needed medical

14     care?

15         A.  It was minor.  It was just the cuffs

16     were tight.  It was that serious, but once

17     they was off I was a little better.  It ain't

18     like circulation or blood my hands got a

19     little swollen, I told her nothing.  I didn't

20     want no attention or nothing.  They tell you,

21     you know, you go to the hospital or whatever

22     it's going to hold your case up and you know

23     all that.  And it wasn't that serious.

24         Q.  After you spoke with that person,

25     did they then put you in a holding cell?

C. MITCHELL

1

2     A.   Yes.

3     Q.   How long did you stay in that

4  holding cell for?

5     A.   I stayed in there for -- they moved

6  -- well, all right that first holding cell I

7  stayed in there for maybe three or four

8  hours.  And then they moved me to another

9  holding cell.  It was like from holding cell

10  to holding cell.  It was like altogether a

11  total of time, I would say about maybe

12  twelve, thirteen hours somewhere maybe more.

13  I lost count.

14     Q.   During those approximately twelve or

15  thirteen hours in the different holding

16  cells, did any officers or anyone from

17  Central Booking come over to you and ask you

18  any questions or have a conversation with

19  you?

20     A.   No.

21     Q.   When approximately those twelve or

22  thirteen hours were up, where did they take

23  you to next?

24     A.   I went upstairs and saw the judge --

25  well, I saw my lawyer.

C. MITCHELL

1

2    Q.   The lawyer that you met with, was

3    that lawyer appointed by the court or was

4    that your personal attorney?

5    **A.   Appointed by the court.**

6    Q.   Do you remember that attorney's

7    name?

8    **A.   It was a woman. I know it was**

9    **Catherine.   Catherine, I don't remember her**

10    **name fully.   I know her first name was**

11    **Catherine.**

12    Q.   That's okay. When you went before

13    the judge, did they read the charges against

14    you?

15    **A.   Yes.**

16    Q.   What were you charged with at that

17    point?

18    **A.   I don't remember.   But I know it was**

19    **possession and they said something else, but**

20    **I don't really remember what that was, but it**

21    **was a lesser charge.**

22    Q.   After they read the charges against

23    you, how did you plead?

24    **A.   I pled not guilty.**

25    Q.   After you pled not guilty, did the



```
 1                    C. MITCHELL
 2   judge let you go or did they keep you?
 3        A.   They remanded me.
 4        Q.   Where did you go?
 5        A.   I went to Rikers Island.
 6        Q.   At any time after your arraignment
 7   when you were remanded to Rikers Island, did
 8   you ever go back before a judge or the grand
 9   jury?
10        A.   I went back.  I was just telling my
11   lawyer that I wanted to go to the grand jury.
12        Q.   Are you referring to the legal aid
13   attorney?
14        A.   Yes.
15        Q.   Did you in fact go before the grand
16   jury?
17        A.   Yes, I did, but she did something
18   that I didn't like and you know, she tried to
19   get me to, you know, she was telling me about
20   my record and such and such and doesn't think
21   its a good idea, you know.  Trying to not let
22   me go.
23             MR. COHEN:  Attorney/client
24        privilege.
25             MS. SHWARTZ:  Yes.
```



C. MITCHELL

1

2      MR. COHEN:  Don't say anything

3         else about your conversations that

4         you had with your lawyer.

5      A.  Okay.

6      Q.  Don't tell me the details of your

7  conversation.

8      A.  Okay.

9      Q.  Let me ask you this, did you go

10  before the grand jury?

11     A.  Yes.

12     Q.  Do you remember the date you went

13  before the grand jury?

14     A.  It was -- I don't know the exact

15  date.

16     Q.  Do you recall what month?

17     A.  It was the same month. It was May.

18     Q.  Do you recall if it was May 20th of

19  2011?

20     A.  It was before the 20th.  It was

21  exactly eight days afterwards. Somewhere

22  between eight and nine.

23     Q.  After the arrest?

24     A.  Yes, somewhere along there.

25         MS. SHWARTZ: Off the record.

1                    C. MITCHELL
2              (Whereupon, a discussion was held
3          off the record.)
4              MS. SHWARTZ: Back on.
5       Q.  Do you remember what date you got
6    released from Rikers Island?
7       A.  It was a Thursday from the time that
8    I got locked up.  It was that following -- I
9    got locked up May 5th, I believe it was a
10   Tuesday.  I'm not sure.  Maybe those day, but
11   I know that following week, Thursday I got
12   released.
13      Q.  Meaning, the whole next week later
14   and not three days later?
15      A.  No, that week.  Next week.
16              MR. COHEN:  Not two weeks
17          later.
18      A.  Not two weeks. Cause I know my
19   180-80 was like on a Tuesday and then they
20   didn't -- I was going to court like every
21   day.  And I finally made it to the grand jury
22   and they sent me back and before 11:00 at
23   night.  They called me to pack my stuff and I
24   waited down in the receiving room and then
25   they just released me.  Then I got the letter

C. MITCHELL

1

2    from the lawyer -- I mean, not the lawyer the

3    DA.

4        Q.  When you got the letter from the DA,

5    you had already been released from Rikers;

6    right?

7        A.  Yes.

8        Q.  That letter was letting you know

9    that all the charges had been dismissed?

10       A.  Yes.

11       Q.  After you were released from Rikers,

12   where did you go?

13       A.  I had went back to 433 real early in

14   the morning, maybe 6:00.  Maybe so I went

15   there.

16       Q.  When you went back there, did you

17   have an opportunity to observe the condition

18   of the apartment?

19       A.  Yes, I did.

20       Q.  Can you describe to me what the

21   apartment looked like when you went back?

22       A.  It was -- it was towed up, towed up.

23   Everything was turned over.  Flipped over.

24   Pulled out, stuff everywhere.  I mean, she

25   recorded it and everything.  But she said she

C. MITCHELL

1  wasn't going to touch nothing.

3       Q.  She meaning who?

4       A.  Ann.

5       Q.  Do you know how she recorded it?

6       A.  She had a little camcorder.

7       Q.  So video?  She recorded it on video?

8       A.  Yes, the condition

9       Q.  Do you know where did that video is

10  now?

11      A.  I believe she has it.

12      Q.  Let me ask you this, do you keep any

13  personal belongings at the apartment?

14      A.  I have some clothes there.

15      Q.  When you went back to the apartment

16  after being released from Rikers, were any of

17  your personal belongings missing?

18      A.  Well, nothing really that I can

19  recollect.  It was just everything was towed

20  up.  Disarrayed.

21      Q.  After you were released from Rikers,

22  did you seek medical attention for any

23  injuries you might have sustained while you

24  were you in police custody?

25      A.  No.



Reporter's Ink, Corp.   90 John Street - Ste. 411    New York, NY 10038    www.reporters-ink.com
Phone: 646.395.2522    Fax: 212.374.1236

37

## C. MITCHELL

1

2      Q.  After you were released from Rikers,

3   did you seek treatment from any type of

4   mental health professionals?  Psychiatrist,

5   psychologist, social worker?

6      A.  No.

7      Q.  Regarding what had happened.

8      A.  No.

9          MS. SHWARTZ:  I don't have any

10         other questions for you.  Thank you

11         for coming in today.

12         MR. COHEN:  Thank you.

13         (Time noted 12:54 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      C. MITCHELL

2              A C K N O W L E D G E M E N T

3

4    STATE OF NEW YORK)

5

6       I, Curtis Mitchell, hereby certify that I

7    have read the transcript of my testimony taken

8    under oath on January 24, 2012, that the

9    transcript is a true, complete and correct

10   record of what was asked, answered and said

11   during my testimony under oath, and that the

12   answers on the record as given by me are true

13   and correct.

14

15

16

17   _____

18

19

20   Signed and subscribed to

21   before me, this _____ day

22   of _____, _____.

23

24   _____

25   Notary Public
```



1                          C. MITCHELL

2                      C E R T I F I C A T E

3          I, KARLA VALLARO, a shorthand

4    reporter and Notary Public within and for

5    the State of New York, do hereby certify:

6          That the witness(es) whose testimony

7    is hereinbefore set forth was duly sworn by

8    me, and the foregoing transcript is a true

9    record of the testimony given by such

10   witness(es).

11         I further certify that I am not

12   related to any of the parties to this

13   action by blood or marriage, and that I am

14   in no way interested in the outcome

15   of this matter.

16

17

18

19

20

21

22                    _Karla Vallaro_

23

24              KARLA VALLARO

25



ORIGINAL

50-H HEARING                          015220

- - - - - - - - - x BLA: 2011PI027481

In the Matter of the Claim of

DEMETRICE PERRY,

        Claimant,

    -against-

CITY OF NEW YORK, CITY OF NEW YORK POLICE

DEPARTMENT,

     Respondents.

- - - - - - - - - - - - - - - x

          225 Broadway, 13th Floor
          New York, New York

          January 24, 2012
          12:56  p.m.


   50-H HEARING of Demetrice Perry, the

Claimant in the above-entitled action, held at

the above time and place, pursuant to Notice,

taken before Karla Vallaro, a shorthand

reporter and Notary Public within and for the

State of New York.

Ex. A-2



Reporter's Ink, Corp.   90 John Street - Ste. 411   New York, NY 10038   www.reporters-ink.com
Phone: 646.395.2522   Fax: 212.374.1236

1

2               A p p e a r a n c e s:

3     IRVING COHEN, ESQ.
           ATTORNEY for Claimant
4           233 Broadway, Suite 2701
           NEW YORK, NY 10279
5     BY:  IRVING COHEN, ESQ.

6

7

     SHAPIRO, BEILLY & ARONOWITZ, LLP
8           ATTORNEYS for Respondent
           225 Broadway, 13th Floor
9           New York, NY 10007
     BY:  DAWN SHWARTZ, ESQ.
10          FILE #: NYC-2213
          INDEX #: 2011PI027481

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                     D. PERRY

2    DEMETRICE PERRY, the witness herein, having

3    been first duly sworn by a Notary Public of

4    the State of New York, was examined  and

5    testified as follows:

6    EXAMINATION BY

7    MS. SHWARTZ:

8         Q.  State your name for the record,

9    please.

10        A.  Demetrice Perry.

11        Q.  State your address for the record,

12   please.

13        A.  433 Lafayette Avenue, Apartment 12A,

14   Brooklyn, New York 11238.

15        Q.  Good afternoon, ma'am.  My name is

16   Dawn Shwartz and I represent the City of New

17   York for the purposes of today's hearing.

18   I'm going to be asking you some questions

19   about your claim against the city.

20            I'm going to ask that all of your

21   answers to my questions are verbal, so that

22   the court reporter can take down everything

23   that we're saying, because she can't take

24   down head shakes, head nods or hand gestures.

25        A.  Okay.



4

**D. PERRY**

1

2    Q.  If you don't understand my question,

3    just let me know.  I'll try to rephrase it or

4    say it in a different way.  If you need to

5    speak with your attorney for any reason or

6    take a break, that's not a problem.  Just let

7    us know.

8    **A.  Okay.**

9    Q.  All I ask is that you answer the

10    last question that I asked you before you go

11    ahead and take that break.  I'm also going to

12    ask that even if you what I'm going to ask

13    you and you already know the answer, you let

14    me finish asking and then give your answer,

15    because she can only take down what one of us

16    is saying at a time.

17    **A.  Okay.**

18    Q.  How long have you lived at the

19    address that you just gave to the reporter?

20    **A.  Twelve years.**

21    Q.  Does anyone currently live there

22    with you?

23    **A.  Yes, my son, Shaquwan.  Shaquwan**

24    **Perry.**

25    Q.  Does anyone else live there with



1                         D. PERRY

2    you?

3        A.  No.

4        Q.  Does anyone else stay there with you

5    on a regular basis?

6        A.  Curtis Mitchell comes and stays once

7    in a while.  Like weekends sometimes, you

8    know.

9        Q.  Out of a seven-day week, how many

10   nights a week does Mr. Mitchell stay with

11   you?

12       A.  I would say about, four.

13       Q.  Are you known by any other name or

14   alias?

15       A.  No.

16       Q.  Have you ever gone by the name of

17   Ann?

18       A.  Yes, that's my middle name.

19   Demetrice Ann.

20       Q.  Does anybody refer to you by that

21   name or know you by that name?

22       A.  Yes, because I prefer Ann.  I don't

23   like my first name Demetrice.

24       Q.  You go by Ann?

25       A.  Yes.

```
1                        D. PERRY
2       Q.  What is your social security number?
3       A.  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.
4       Q.  Your date of birth?
5       A.  12/5/63.
6       Q.  Are you currently employed?
7       A.  No, not at the time.  I just
8   finished the job in December.
9       Q.  What job was that?
10      A.  Urban Space.
11      Q.  What is that?
12      A.  It was down -- like outside mall.
13  Dealing with they had vendors with stores and
14  food.  It's Downtown Brooklyn.
15      Q.  What did you do there?
16      A.  Maintenance.
17      Q.  In May of 2011, were you employed?
18      A.  Yes.
19      Q.  What were you doing at that time?
20      A.  Working for Urban Space.
21      Q.  In maintenance?
22      A.  Yes.
23      Q.  In May of 2011, were you earning
24  income any other way, aside from doing
25  maintenance for Urban Space?
```